(C. D. 936)

WASHINGTON HANDLE CO. v. UNITED STATES

United States Customs Court, First Division

(Decided June 30, 1945)

Lawrence & Tuttle (George R. Tuttle and Frank L. Lawrence of counsel) for the plaintiff.

Paul P. Rao, Assistant Attorney General (William J. Vitale, Dorothy C. Bennett, and Richard F. Weeks, special attorneys), for the defendant.

Before OLIVER and COLE, Judges

COLE, Judge: The Washington Handle Co. of Tacoma, Wash., imported through the port of Seattle a shipment of merchandise

invoiced as "Rough-turned Fir Sticks," which the collector classified as broom handles further advanced than rough shaped, under the specific provision for such merchandise in paragraph 412 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 412), as amended by the Canadian Trade Agreement, 74 Treas. Dec. 235, T. D. 49752, and assessed duty at 20 per centum ad valorem. Plaintiff makes two claims; first, that the articles are classifiable under paragraph 406 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 406), as amended by the said trade agreement with Canada, the specific contention being that the instant merchandise is within the class of "like sticks" contemplated by said amended paragraph 406, reading as follows:

Hubs for wheels, heading bolts, stave bolts, last blocks, wagon blocks, oar blocks, heading blocks, and all like blocks or sticks, roughhewn, or rough shaped, sawed or bored, 5% ad val.

The alternative claim is that there existed, prior to the action of the collector in this case, an established and uniform practice of classifying this merchandise under amended paragraph 406, *supra*, and that therefore the higher rate assessed herein cannot become effective prior to the expiration of 30 days after publication of the notice of the increase in the TREASURY DECISIONS, which was not given. Section 315 of the Tariff Act of 1930, as amended by section 6 of the Administrative Act of 1938 (19 U. S. C. 1940 ed. § 1315), and the favored-nation clause (article I) of said Canadian Trade Agreement, coupled with article VI of the Colombian Trade Agreement, 69 Treas. Dec. 661, T. D. 48258, form the basis for the claim of long-continued administrative practice.

There is no dispute concerning the processing followed in the country of exportation to produce the imported articles under consideration. Square pieces of Douglas fir, cut to specific lengths (42", 48", or 54") and three-sixteenths of an inch greater in diameter than the finished product, are manipulated through a machine of multiple operations. The squares are fed into a hopper and conveyed by rollers into a revolving head where knives and cutter blades turn the shape and remove the square corners, making a round handle, as the wood moves from end to end through the machine. After being rounded, the wood continues "down into two ratchet wheels" which hold the handle firmly in a position permitting a chucking tool to round one end and a drill to bore a hole in the other end. Of the four samples in evidence, two (exhibits 1 and 4) did not have the drill connected, and two (exhibits 2 and 3) have the hole bored. Otherwise, each was subjected to the identical operations. All of the merchandise was then kiln dried, by which the articles are thoroughly dried under 180 degrees of heat for a period of 48 hours. The president of the manufacturing and exporting company explained the purpose for kiln drying as follows (R. 14): "Handles have to be dry otherwise they would not take

a sanding finish; they could not be sanded unless they were dry. And in the case of a corn broom they would shrink and the broom would fall off. In the case of these particular exhibits the question of shipping weight is a big factor, and the fact that that is the most economical point at which to make the operation, because the handles cannot be rounded on one end after they are dried." The economic phase of the drying process relates to the reduction in shipping weight, obtained by the lowering of moisture content from an average relative content of 60 per centum to 7 per centum. But the financial aspect of the kiln-drying treatment is incidental, so far as the present issue is concerned. Its importance here lies in its effect to prevent shrinkage of the wood, insure proper fitting of the handles to the broom, and the preparation of the surface for the sanding finish.

Plaintiff concedes that the imported articles are in fact broom handles, but claims that they have not been advanced beyond being rough shaped. The admission by counsel was made as follows (R. 19):

Mr. Tuttle. * * * Now, we admit that these articles are broom handles. We admit that they have been rough-shaped, but we contend that they have not been further advanced than rough-shaped.

We cannot agree with this contention. The combined manufacturing operations, prior to importation, have produced something more than rough-shaped sticks. The processed wood, after assuming the dome shape of a handle dedicating it to its ultimate use, is removed from the green state to a condition adapting it to effective and exclusive use as broom handles. The imported articles are unfinished broom handles. They are incomplete only to the extent that they require sandpapering to smooth the surface of the wood, preliminary, in most cases, to the application of a coat of lacquer and final grading into sizes. Nothing in the manipulation after importation improves or enhances the shape of the articles. The finishing work in plaintiff's plant merely presents a more attractive and possibly better salable article of commerce. It would be difficult for one, looking at the samples in evidence (exhibits 1 to 4, inclusive), to conclude, aside from any testimony, otherwise than that the articles are broom handles.

*United States* v. *Pacific Customs Brokerage Co.*, 31 C. C. P. A. 102, C. A. D. 256, cited by plaintiff, does not support classification of these broom handles under amended paragraph 406, *supra*. The cited case involved so-called dimension stock, consisting of "sticks, or pieces of wood," made from slabs sawed from birch logs in the process of shaping the logs for the manufacture of lumber. The court found that no process had been applied to the merchandise before importation which advanced it beyond what may be described as the rough-sawed stage, and that it was ultimately used for the manufacture of

various types of wooden articles "(such as various kinds of brush handles, putty knife handles, vegetable knife handles, broom handles, etc., toys or toy parts, and parts of furniture)." In excluding the merchandise from paragraph 406, the court observed that the merchandise was "in as crude a state as any piece of wood sawed to dimension could possibly be." The converse is true of the broom handles under consideration. Here, the articles have been manufactured to a point, bringing them within the advanced class of merchandise contemplated by paragraph 412, *supra*—a tariff category which the trade agreement negotiators carved out of the catch-all provision for manufactures of wood, not specially provided for, in paragraph 412 as originally enacted, where the present articles would otherwise be classified.

In support of the claim that a long-continued administrative practice prevailed, classifying this merchandise under paragraph 406 of the Tariff Act of 1930, counsel for plaintiff, in their brief, rely to a very great extent, if not entirely, on an order of the Secretary of the Treasury, 62 Treas. Dec. 199, T. D. 45887, promulgated on September 19, 1932. So far as material to the present issue, that official order related to "so-called sticks made by turning on a lathe," similar to the hardwood sticks which had been held by this court, *F. W. Myers & Co.* v. *United States* (53 Treas. Dec. 871, Abstract 5080), and *same* v. *same* (53 Treas. Dec. 1037, Abstract 6127), to be free of duty as wood, unmanufactured, under paragraph 1703 of the Tariff Act of 1922. Both of the said *Myers* cases were based on the same record, the latter being the subject of a stipulation following the former. Hence, for the purposes of this discussion, we shall refer to Abstract 5080, being in effect a test case, as the *Myers* case, *supra*.

There, the merchandise consisted of a piece of wood taken from the board and then merely turned into a round shape. The sole witness in the case was the importer, who testified that the merchandise had to be further manufactured through "other forms of milling" to fit it for its ultimate use as "various articles, such as brooms, mops, carpet sweepers, umbrellas, canes and other things." No attempt was made in the present case to show that the broom handles under consideration are substantially the same as the sticks involved in the *Myers* case, *supra*, but plaintiff, in its reply brief, argues that "assumably" the merchandise in the *Myers* case and the present case is the same. Such an assumption, however, would be without foundation in fact, for a careful examination of the records in both cases reveals a material difference between the commodities involved in each. The articles in question have been subjected to additional manufacturing operations producing broom handles further advanced in processing than the sticks upon which the Treasury order, said T. D. 45887, was based.

The testimony adduced herein lends no support to the claim of a uniform and established practice in classifying the present merchandise. Plaintiff, the sole importer of these broom handles, began receiving them in October 1939, and entries relating to the earliest shipments were liquidated at the 5 per centum rate of duty under said amended paragraph 406. In September 1941, liquidation of such entries was suspended pending ·information from the Bureau of Customs as to whether the 20 per centum assessment under amended paragraph 412, *supra*, should be adopted, and, as testified by the deputy collector (R. 112) "sometime in January of 1942, we finally received instructions from the Bureau that there had not been a uniform practice throughout the United States," and to proceed to liquidate the withheld entries at the higher rate, which was done and has, ever since, been followed.

The record herein does not warrant a finding of long-continued administrative practice supporting the classification urged by plaintiff, and in denying such claim we find it appropriate to quote the following from *P. Silverman & Son* v. *United States*, 32 C. C. P. A. 29, C. A. D. 292:

\* \*· \* But, even if long-continued administrative practice had been established, that fact alone would not be controlling. It would be important in the consideration of the applicability of the doctrine of legislative approval of long-continued administrative practice, but the application of that doctrine is not urged here. \* \* \*.

\* \* \* Of course, it is a consideration, which, under certain circumstances, would have great weight in the decision of a close issue; but to hold that, in all cases, administrative practice, even though long-continued and uniform throughout the United States, should bar a subsequent change in classification if the circumstances warranted making such a change would perpetuate error until changed by Congress, would greatly hamper the proper administration of the customs laws, and therefore would be a dangerous principle to follow.

The rule of long-continued administrative practice would find application herein only to give proper effect to the intention of the negotiators of the Canadian Trade Agreement in their enactment of paragraph 412, *supra*. In fixing the classification of the articles in question, we find it unnecessary to invoke that statutory rule of construction for these unfinished broom handles, not less than three-fourths of ·1 inch in diameter nor shorter than 38 inches in length, and further advanced than rough shaped, fall squarely within the descriptive provision for such merchandise in said amended paragraph 412, as classified by the collector.

The protest is overruled and the decision of the collector is affirmed. Judgment will be rendered accordingly.